UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Douglas Ball, Jr.,

        Petitioner,                      Case Number: 21-12617
                                                                 Honorable F. Kay Behm

v.

James Corrigan,[1]

        Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF
HABEAS CORPUS, DENYING CERTIFICATE OF APPEALABILITY,
AND GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS**

Petitioner Douglas Ball, Jr., currently in the custody of the Michigan Department of Corrections, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his convictions first-degree murder and torture.

The petition raises five claims. For the reasons explained below, the Court denies the petition. The Court denies a certificate of appealability and grants Petitioner leave to proceed on appeal *in forma pauperis*.

## I. Background

Following a jury trial in St. Clair County Circuit Court, Petitioner was convicted of first-degree murder, Mich. Comp. Laws § 750.316, under multiple theories: (a) premeditation (Mich. Comp. Laws § 750.316(1)(a)) and (b) felony murder (Mich. Comp.

---

[1] The proper respondent in a habeas case is the warden of the facility where the petitioner is incarcerated. See Rule 2(a), Rules Governing § 2254 Cases. Thus, the Court substitutes the warden of the prison where Petitioner is incarcerated, James Corrigan, as the respondent.

Laws § 750.316(1)(b)), and of torture, Mich. Comp. Laws § 750.85.  On June 1, 2017, he was sentenced as a second offense habitual offender to life imprisonment for the murder conviction and 19 to 30 years for the torture conviction.

Petitioner filed an appeal by right in the Michigan Court of Appeals.  The Michigan Court of Appeals set forth the following relevant facts:

> Defendant's convictions arise from the death of his wife Lydia Ball that occurred in the basement of the home, which they shared with their five-year-old son and her parents, Larry and Roxanne.  Lydia was last seen alive in the home on the night of August 18, 2016.  The next morning defendant told Lydia's parents that Lydia had risen early to apply for a job.  Throughout the day of August 19, defendant told Lydia's parents that he was receiving text messages from Lydia.  He reported to them that Lydia was out with a friend and later that night that Lydia had decided to stay over at the friend's house.  The following morning, defendant told Lydia's parents that Lydia needed to be picked up from her friend's house an hour and a half away.  When her parents left, defendant packed up their son's belongings and took multiple items from the house to a local pawnshop.  After pawning the items, defendant drove to his mother's place of employment and asked her if he could stay at her home.  Defendant told his mother that he and Lydia had an argument, and that out of fear of losing his son he was considering going to Tennessee.  Lydia's parents followed the directions given by the defendant to retrieve Lydia but discovered that the address was to the Ira Township Fire Department.  When they returned, Roxanne discovered Lydia's body in the basement with a bag over her head and bound at the hands and feet.  Roxanne testified that it appeared as if bleach had been poured over Lydia's clothes. Defendant was arrested at his mother's home the following day, August 20.
>
> The trial testimony from the medical examiner was that Lydia was struck 14 times in the scalp with a heavy blunt object that left a pattern similar to that of the homemade mallet discovered near her body.  Without objection, law enforcement witnesses testified that defendant's cellular phone had not received text messages from Lydia asking to be picked up from Ira Township.  Further, the friend whom defendant said Lydia was with testified that she had not seen Lydia in months and was not with her on the days in question.  Lydia's cellphone was never recovered, however phone records established that all but one of the texts sent from her phone to defendant's phone were affiliated with a tower near her parent's residence.

2

> Other evidence was presented including several bottles of bleach found during the crime scene investigation. The jury found defendant guilty of first-degree murder and torture.

*People v. Ball*, No. 339131, 2019 WL 2306151, at *1 (Mich. Ct. App. May 30, 2019). These facts are presumed correct on habeas review under 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009).

The Michigan Court of Appeals affirmed Petitioner's convictions and sentences. *Ball*, 2019 WL 2306151. Petitioner sought and was denied leave to appeal in the Michigan Supreme Court. *People v. Ball*, 504 Mich. 1000 (Mich. Oct. 29, 2019), *cert. denied* 140 S. Ct. 2579 (March 30, 2020).

Petitioner then returned to the trial court to file a motion for relief from judgment. The trial court denied the motion. *See* 7/23/20 Order (ECF No. 7-16). Petitioner's application for leave to appeal was denied by the Michigan Court of Appeals. *People v. Ball*, No. 354692 (Mich. Ct. App. Nov. 30, 2020). The Michigan Supreme Court also denied leave to appeal. *People v. Ball*, 508 Mich. 953 (Mich. 2021).

Petitioner then filed this habeas petition. He seeks relief on these claims:

I. Insufficient evidence was presented to support the conviction of torture and the trial court's jury instruction made it impossible to determine if verdict was unanimous.

II. Due process violation where evidence was entered into trial without the proper chain of custody/foundation which assures that no cross contamination occurred.

III. Defendant was denied the effective assistance of trial and appellate counsels because they refused to petition the trial court to test the untested rape kit. Only 7 samples of DNA evidence were tested by investigation agencies, this disregard for conducting a full investigation resulted in a due process violation.

IV.    Defendant's due process rights under the Fifth and Fourteenth Amendments were violated because of prosecutorial and investigation agencies misconduct.

V.    Verdict is against the great weight of the evidence, which is a due process violation of defendant's rights.

Respondent has filed an answer in opposition arguing that Petitioner's second through fifth claims are unexhausted and that all claims are meritless. (ECF No. 6.) Petitioner has filed a reply brief. (ECF No. 8.)

## II.  Standard

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes "important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases." *Shoop v. Hill*, 139 S. Ct 504, 506 (2019). A federal court may grant habeas corpus relief only if the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of," Supreme Court precedent that was "clearly established" at the time of the adjudication. 28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. To obtain habeas relief in federal court, a state prisoner must show that the state-court's

4

rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011)

For claims that were adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III. Discussion

### A. Procedural Default

As an initial matter, Respondent contends that some of Petitioner's claims are barred by procedural default. It is well-settled, however, that federal courts on habeas review "are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The Supreme Court has explained the rationale behind such a policy: "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the procedural default issues are intertwined with the substantive issues, and the substantive issues are easier to resolve. Consequently, the interests of judicial economy are best served by addressing the merits of Petitioner's habeas claims.

### B. Claim One: Sufficiency of the Evidence and Unanimity Instruction

In his first claim, Petitioner argues that the trial court erred in failing to instruct the jury that it had to reach a unanimous verdict between the alternate theories of liability for first-degree murder – premeditated or felony murder. He also maintains that the prosecution presented insufficient evidence to support his conviction for torture.[2]

#### 1.

With respect to Petitioner's jury instruction claim, the Michigan Court of Appeals held that the jury instructions were not improper and that a specific unanimity instruction was not required with respect to premeditated murder or felony murder. *Ball*, 2019 WL 2306151, at *2.

Petitioner is not entitled to relief on his claim that he was denied his right to a unanimous verdict. From the time of Petitioner's trial through the time his conviction became final, no clearly established precedent extended the Sixth Amendment guarantee of a unanimous jury trial verdict to the states. *See Apodaca v. Oregon*, 406 U.S. 404, 406-14 (1972) (a unanimous jury verdict in state criminal prosecutions is not required by the Sixth and Fourteenth Amendments); *Johnson v. Louisiana*, 406 U.S. 356, 359–63 (1972) (rejecting a due process challenge to non-unanimous state jury verdict). On April 20, 2020, approximately one month after Petitioner's direct appeal ended, the Supreme Court held in *Ramos v. Louisiana*, 590 U. S. 83 (2020), that a state jury must be

---

[2] Petitioner also argues in his fifth claim that the verdict was against the great weight of the evidence. A claim that a verdict is against the great weight of the evidence is a state-law claim not cognizable on federal habeas review. *See Nash v. Eberlin*, 258 F. App'x 761, 765, n.4 (6th Cir. 2007).

unanimous to convict a criminal defendant of a serious offense. The Supreme Court held in *Edwards v. Vannoy*, 593 U.S. 255 (2021), that *Ramos* did not "apply retroactively on federal collateral review." *Id.* at 276. In other words, Petitioner may not rely on *Ramos* for relief.

"Clearly established" law did not mandate the extension of the Sixth Amendment's unanimous jury verdict guarantee to the states at the time Petitioner's conviction became final upon completion of state court direct review. The state court's decisions, therefore, was not an unreasonable applications of Supreme Court precedent.

**2.**

The Michigan Court of Appeals also denied Petitioner's sufficiency of the evidence claim:

> ...The elements of premeditated first-degree murder are that the defendant killed the victim and that the killing was either "willful, deliberate, and premeditated." MCL 750.316(1)(a); *People v. Bowman*, 254 Mich. App. 142, 151; 656 N.W.2d 835 (2002).
>
> Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to support that defendant was Lydia's murderer. The exact time of Lydia's death was unknown. Dr. Spitz opined that the timeframe however, was narrow, being sometime between August 18, when Lydia was last seen alive, "[p]ossibly going into the 19th." The evidence supports that only the defendant, his five-year-old son, Larry and Roxanne were in the home during that period. Expert testimony established that Lydia was murdered in the basement and her body was found there on August 20. According to the testimony of Lydia's parents, the defendant was the only person with access to the basement between the afternoon of April 18 until August 19. Specifically, Roxanne testified that the defendant prohibited her from entering the basement when she wanted to do laundry. Defendant's fingerprints were found on those trash bags containing bleach recovered by the police. The victim's blood was found on clothing connected to the defendant. A footprint matching the defendant's was found in the basement near the body of the deceased. There was also

7

evidence presented that at some point Lydia's blood came in contact with the defendant's fingers. Additionally, defendant's only theories, that Lydia was killed by an outside intruder or by [her] brother Edward, were unsupported. There was no evidence of outside entry by an intruder and Edward's alibi that he was at work or at home during the period at issue was supported by his employer and roommates.

There was also sufficient evidence of premeditation in defendant's case. To "premeditate" is to "think about beforehand" and to "deliberate" is to "measure and evaluate the major facets of a choice or problem." *People v. Bass*, 317 Mich. App. 241, 266; 893 N.W.2d 140 (2016) (quotation marks and citation omitted). ... The jury could first infer premeditation from the weapon used in the killing. *People v. Jackson*, 171 Mich. App. 191, 199; 429 N.W.2d 849 (1988). Dr. Spitz concluded that Lydia's scalp injuries, which led to her death, were caused by the welding hammer found in the basement near her body. Both defendant and Lydia's brother Edward owned a welding hammer. Edward identified the hammer found near Lydia's body as his. Both Edward and Larry testified that Edward's hammer was last seen in Larry's vehicle where it was normally kept because Larry had driven Edward and defendant to work. Edward had since moved out of his parents' home, was no longer working as a welder, and had left his mallet behind in the vehicle. No one testified to having brought the hammer into the house nor was there testimony that the vehicle had been broken into to support anyone else having had possession of it. The jury could infer that defendant, who still lived with Edward's parents in their home with Lydia, had access to the murder weapon. Premeditation could be established either by the time that it took to retrieve the weapon or in the decision and plan to take the weapon to the basement to murder Lydia. Lydia's defensive wounds, in the form of bruises and abrasions on her fingers, hands and arms, were further evidence of premeditation. ... The time in which Lydia was defending herself was the same time allotted defendant to measure and evaluate his actions. "[E]vidence that a victim sustained multiple violent blows may support an inference of premeditation and deliberation" as well. *People v. Unger*, 278 Mich. App. 210, 231; 749 N.W.2d 272 (2008). Dr. Spitz testified that Lydia suffered "14 severe lacerating wounds" to her scalp. Again, each blow to the head was an interval of time in which defendant could take a second look. This Court has also held that evidence of a struggle between the defendant and the victim can be evidence of premeditation and deliberation. *People v. Johnson*, 460 Mich. 720, 733; 597 N.W.2d 73 (1999). Here, law enforcement and Dr. Spitz observed that Lydia's pants were torn from the back. Roxanne testified that items she kept stored in the basement were knocked over on the floor. Forensic scientists noted blood spatter in

8

multiple areas throughout the basement. This evidence showed that a struggled ensued between defendant and Lydia. It also supported the jury finding that defendant had time to think beforehand.

A substantial amount of circumstantial evidence showing consciousness of guilt was also submitted to the jury. The jury was allowed to infer consciousness of guilt from evidence of defendant's lying and deception as to Lydia's whereabouts. *Unger*, 278 Mich. App. at 227. Defendant's effort to destroy evidence of the murder with bleach also showed consciousness of guilt. ... Evidence that defendant fled the home after Lydia's parents left and told his mother he intended to leave the state further inferred consciousness of guilt. ... "Michigan authority appears uniform in holding that actions by the defendant such as flight to avoid lawful arrest, procuring perjured testimony and attempts to destroy evidence, while possibly as consistent with innocence as with guilt, may be considered by the jury as evidence of guilt." *People v. Casper*, 25 Mich. App. 1, 7; 180 N.W.2d 906 (1970).

Viewing the evidence in a light most favorable to the prosecution, it was sufficient for the jury to find that defendant premeditated Lydia's murder.

"The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v. Gayheart*, 285 Mich. App. 202, 210; 776 N.W.2d 330 (2009). The predicate felony relied on by the prosecution was torture. A person is guilty of torture if "with the intent to cause cruel or extreme physical or mental pain and suffering, [he] inflicts great bodily injury or severe mental pain or suffering upon another person within his ... custody or physical control...." MCL 750.85(1).

There was sufficient evidence of the underlying felony of torture for the jury to find defendant guilty both of that underlying offense and of first-degree murder under a felony murder theory. Defendant concedes that Lydia's injuries support finding that there was the intent to cause extreme physical pain and suffering, and that great bodily injury was inflicted. Defendant therefore disputes only that Lydia was under his custody and control. MCL 750.85 defines "custody or physical control" as "the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority." MCL 750.85(2)(b). Defendant argues that the

statute requires that the element of "forcible restriction or forcible confinement" be construed as separate acts from the attack itself. Defendant cites no authority for this interpretation and when plainly read, there is no temporal requirement in the statute. Defendant's choice of location to commit the murder as well as evidence at the crime scene however support finding that Lydia's movements were forcibly restricted or confined.

The evidence of confinement was significant. Defendant and Lydia lived with their son and Lydia's parents. Confining Lydia to a single area was necessary to avoid detection and complete the murder in the home. Forensic Scientists Shane Hill and Teresa Scott testified that the murder occurred in the basement. Edward and Roxanne testified that they would not have been able to hear anything occurring in the basement from the second story. The basement was an area of seclusion. The location was also easier for defendant to exert control over Lydia because there was only one way out, by use of the stairway, which was easy for defendant to block.

There was considerable evidence of the victim's struggle with her assailant. Dr. Spitz testified that the back waistband of Lydia's pants was torn. Hill and Scott testified that there was blood spatter throughout the basement. From this evidence, the jury could infer that Lydia tried to escape from defendant.

There was, also, evidence of torture. As noted above, the deceased was found bound. She was subjected to no less than 14 blows to the head. Contrary to defendant's position, this evidence also illustrates the forcible confinement of an active victim, and not someone who was unable to escape merely because she lay dying. At some point however, Lydia became inactive as implied by Dr. Spitz's testimony that the zip tie ligatures on Lydia's wrists and ankles indicated that she was no longer struggling at the time of their application. Dr. Spitz did not conclude that Lydia was already deceased when she was bound, rather only that there was no evidence of a struggle at that point. The use of zip ties was a clear application of force to restrict Lydia's movement and forcibly confine her to the basement. It would have been very difficult for Lydia to traverse the staircase with her feet and hands bound behind her. In this case, defendant prolonged the confinement by refusing to allow Roxanne entry to the basement to do laundry on August 19. Further, there was no evidence of jury confusion where defendant was separately charged and convicted of the crime of torture. The fact that the jury found defendant guilty of first-degree murder and the underlying felony used to charge him with felony

10

murder supports that the jury found the theory of felony murder proved beyond a reasonable doubt.

*Ball*, 2019 WL 2306151, at *2-5.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On direct review, review of a sufficiency of the evidence challenge focuses on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Sufficiency-of-the-evidence claims, considering both *Jackson* and AEDPA, face a high bar in habeas proceedings because they are subject to two layers of deference:

> First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.
>
> *Coleman v. Johnson*, 566 U.S. 650, 651, 132 S. Ct. 2060, 182 L.Ed.2d 978 (2012) (per curiam) (citations and internal quotation marks omitted).

*Tackett v. Trierweiler*, 956 F.3d 358, 367 (6th Cir. 2020)

Petitioner has not shown that the Michigan Court of Appeals' decision denying relief on this claim was contrary to, or unreasonably applied, clearly established federal law. It is for the factfinder to weigh the evidence, assess the witnesses' testimony, and

11

resolve any conflicts in the testimony or issues of witness credibility. *Jackson*, 443 U.S. at 319. The factfinder, not a federal court on habeas review, has the responsibility "to draw reasonable inferences from basic facts to ultimate facts." *Id.* Petitioner argues that the evidence was insufficient to establish his identity as the killer and to show that the victim was under his custody and control. For all the reasons listed by the Michigan Court of Appeals, there was ample evidence to establish Petitioner's identity as the perpetrator. In addition, the trial evidence demonstrated that the victim moved around the basement, that blood was found throughout the basement, including on the stairs, and that the victim had defensive wounds indicating attempts to extricate herself from the attack. It was not unreasonable for the state court to conclude that a rational juror could find beyond a reasonable doubt that the victim's movements were forcibly restricted or that she was forcibly confined. Habeas relief is denied on this claim.

### C. Claim Two: Admission of Shorts and Related DNA Evidence

Plaintiff's second claim concerns the admission of his blood-stained gym shorts and the testimony about DNA extracted from the blood. He maintains that the evidence should not have been admitted because a proper foundation was not laid, and the victim's mother contaminated the shorts by handling them before their collection by law enforcement breaking the chain of custody.

The Michigan Court of Appeals denied relief on this claim finding first that Petitioner's "contention that there was a break in custody is misplaced where his claim that the shorts were mishandled by [the victim's mother] points to the time before the

12

evidence was seized by law enforcement. ... The chain of custody does not begin until the evidence is seized by the police." *Ball*, 2019 WL 2306151 at *6.

Second, the state court held that a proper foundation was laid for admission of the shorts and related DNA evidence and that the testimony did not support Petitioner's contamination theory:

> Defendant next challenges the forensic finding of Lydia's blood on his shorts by arguing the shorts were contaminated either by Roxanne or by their placement in the cardboard box. There was no evidence, however, that the shorts were contaminated by either. Roxanne testified that she found the shorts in the cardboard box and placed them in a Kroger bag by the front door before she went into the basement and found Lydia. There was no testimony that her hands got blood on them from contact with Lydia's body or that she handled the Kroger bag or shorts after she came up from the basement. Further, the shorts were later found by forensic scientist Lisa Mayfield in the same location as Roxanne testified she left them, near the front door in a Kroger bag. Defendant's argument that the shorts were contaminated by their placement in the box is also unsupported because forensic scientist Hill testified that he searched the large cardboard box and found mostly children's toys and nothing of evidentiary value.
>
> The prosecutor laid the proper foundation for the DNA's admission. The testimony established that the defendant was wearing shorts with Lydia's blood on them around the time of her disappearance and murder. Further, the testimony established that Roxanne's handling of the shorts had not substantially changed their condition before they were collected by law enforcement. Defendant has thus not identified any error, much less outcome determinative error, on this record and the trial court did not err in allowing the DNA evidence to be admitted.

*Ball*, 2019 WL 2306151, at *6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. An alleged trial court error in the application of state procedure or evidentiary law is generally not cognizable as grounds for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a

13

federal habeas court to reexamine state-court determinations on state-law questions"). Such an error does not rise to the level of a federal constitutional claim warranting habeas relief unless it renders the proceeding "so fundamentally unfair as to deprive the petitioner of due process." *McAdoo*, 365 F.3d at 494 (quoting Estelle, 502 U.S. at 69-70, 112 S.Ct. 475).

Petitioner's chain of custody argument merely alleges a violation of state evidentiary rules. Consequently, he fails to state a claim upon which federal habeas relief may be granted as to this issue. Moreover, "gaps in the chain of custody normally go to the weight of the evidence rather than its admissibility." *Melendez-Diaz v. Mass.*, 557 U.S. 305, 311 n.1 (2009). Petitioner does not show that the Michigan Court of Appeals' decision is contrary to, or an unreasonable application of, Supreme Court precedent.

### D. Claim Three: Ineffective Assistance of Counsel

In his third claim, Petitioner argues that he was denied the effective assistance of trial and appellate counsel because counsel did not petition the trial court to test the untested rape kit.

On habeas corpus review, to prevail on an ineffective assistance of counsel claim, Petitioner must show that the state court's denial of his claim was contrary to, or an unreasonable application of, *Strickland v Washington*, 466 U.S. 668 (1984). *Strickland* established a two-prong test for claims of ineffective assistance of counsel: a habeas petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *See id.* at 687.

The standard for obtaining habeas corpus relief is "'difficult to meet.'" *White v. Woodall*, 572 U.S. 415, 419 (2014) (*quoting Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). In the context of an ineffective assistance of counsel claim under *Strickland*, the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable"; but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

This Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Petitioner has not presented any specific evidence other than his own speculation to show how tests would have supported his defense. Trial counsel may have made the reasonable decision not to have the evidence tested to avoid creating additional incriminating evidence against Petitioner. In fact, during cross examination of the forensic scientist, trial counsel used the lack of testing to suggest that a complete investigation was not conducted, and that some unidentified person could have committed the crime. (*See, e.g.,* ECF No. 7-8, PageID.1572.) On this record, defendant failed to overcome the presumption that trial counsel's decision not to request testing of the rape kit was sound trial strategy. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to ... reconstruct

15

the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Petitioner also maintains that appellate counsel was ineffective for failing to move for testing of the rape kit. In the context of an ineffective assistance of appellate counsel claim, a petitioner must show that counsel was objectively unreasonable in omitting a particular claim on appeal and that there is a reasonable probability that, but for counsel's error, petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). A defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the ... goal of vigorous and effective advocacy .... Nothing in the Constitution or our interpretation of that document requires such a standard.

*Jones v. Barnes*, 463 U.S. 745, 754 (1983).

For the same reasons that trial counsel may have reasonably concluded the testing presented a risk of further inculpatory evidence, appellate counsel could have reasonably concluded that the risk/reward analysis counseled in favor of not requesting testing. Petitioner fails to show that counsel was objectively unreasonable for failing to raise this claim.

### E. Claim Four: Prosecutorial Misconduct

Next, Petitioner argues that the prosecutor committed misconduct by failing to have the rape kit and certain blood evidence forensically tested.

16

A prosecutor's misconduct violates a criminal defendant's constitutional rights if it "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct entails much more than conduct that is "undesirable or even universally condemned." *Id.* at 181 (internal quotation omitted). To constitute a due process violation, the conduct must have been "so egregious so as to render the entire trial fundamentally unfair." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (citations omitted).

Neither the police nor the prosecution has "a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988). Accordingly, the Court cannot conclude that the conduct of the police or the prosecution deprived Petitioner of a fundamentally fair trial. Habeas relief is not warranted on this claim.

### IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted). In this case, the Court concludes that reasonable jurists would not

debate the conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted. Therefore, the Court will deny a certificate of appealability.

## V. Conclusion

For the reasons stated, the Court **DENIES** the petition for a writ of habeas corpus and **DENIES** a certificate of appealability.

The Court **GRANTS** Petitioner leave to proceed *in forma pauperis* on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

**SO ORDERED**.

Date: January 24, 2025

s/F. Kay Behm
F. Kay Behm
United States District Judge